# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **BARKAN WIRELESS IP HOLDINGS, L.P.,** | |
| **Plaintiff,** | CIVIL ACTION NO. 2:18-CV-28-JRG |
| **v.** | JURY TRIAL DEMANDED |
| **SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., VERIZON COMMUNICATIONS, INC. and CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS**, | ███████████ |
| **Defendants.** | |

**DEFENDANTS' MOTION TO EXCLUDE
MR. BRATIC'S OPINIONS AND TESTIMONY
UNDER FED. R. EVID. 702 AND _DAUBERT_**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................................. 1

II. STATEMENT OF FACTS AS TO DEFENDANTS' DAUBERT MOTION ................. 3

    A.  Mr. Bratic's Calculated Royalty Rate for Verizon's Purported
        Infringement......................................................................................... 3

    B.  Mr. Bratic's Calculated Royalty Rate for Samsung's Purported
        Infringement......................................................................................... 4

III. LEGAL STANDARDS ..................................................................................... 5

IV. ARGUMENT .................................................................................................. 6

    A.  Mr. Bratic Improperly Invokes the Nash Bargaining Solution to Devise
        Royalty Rates for Both Verizon and Samsung ....................................... 6

    B.  Mr. Bratic Fails to Consider Reasonable Royalty Damages Based on
        Revenue Properly Connected to the Accused Products .......................... 9

    C.  The Court Should Strike Mr. Bratic's Opinions Because He Fails To
        Address The Three-Asserted Patents On An Individual Basis ............. 12

    D.  Mr. Bratic Improperly Opines that Plaintiff Would be Entitled to Two
        Royalty Payments on the Same Accused Products ............................... 14

V.  CONCLUSION .............................................................................................. 15

i

## TABLE OF AUTHORITIES

CASES                                                                         Page(s)

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015)..................................................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993).......................................................................................1, 3, 6

*Ericsson, Inc. v. D–Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)..................................................................................13

*Garretson v. Clark,*
   111 U.S. 120 (1884)...............................................................................................9

*Good Tech. Corp. v. Mobileiron, Inc.*,
   Case No. 5:12-cv-05826, 2015 WL 4090431 (N.D. Cal. Jul. 5, 2015) ....................................8

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
   137 S. Ct. 1523 (2017)..........................................................................................15

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)...............................................................................................6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 ......................................................................................................6, 9

*Moore v. Ashland Chem. Inc.*,
   151 F.3d 269 (5th Cir. 1998) (en banc) ........................................................................6

*Power Integrations, Inc. v. Fairchild Semiconductor*,
   904 F.3d 965 (Fed. Cir. 2018)..................................................................................12

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010)..........................................................................6, 11, 13

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002)...................................................................................6

*Uniloc USA Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)..........................................................................1, 6, 8, 12

*VirnetX, Inc. v. Cisco Sys.*,
   767 F.3d 1308 (Fed. Cir. 2014)..........................................................................6, 7, 8, 9

# TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

### OTHER AUTHORITIES

Fed. R. Evid. 702 ........................................................................................................................6, 15

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| Exhibit 1 | Expert Report of Walter Bratic (March 29, 2019) |
| Exhibit 2 | Summary of Accounts – Exhibit 5.1 to Mr. Bratic's Expert Report |
| Exhibit 3 | Excerpts of Deposition of Dr. Gary Lomp, dated May 6, 2019 |
| Exhibit 4 | Excerpts of Mark Lanning's Rebuttal Expert Report, served April 29, 2019 |

## I.    INTRODUCTION

Defendants move to exclude the opinions of Plaintiff's damages expert, Mr. Walter Bratic, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and the Federal Rules of Evidence because Mr. Bratic's opinions run afoul of Supreme Court and Federal Circuit precedent and constitute speculative and unreliable opinions that are untethered to the claimed inventions of the three patents-in-suit.  His opinions also pose a significant risk of misleading the jury and skewing their opinions as to the appropriate damages in this case.  As set forth below, Mr. Bratic's opinions are improper for at least the following four separate reasons:

First, Mr. Bratic improperly adopts a "50/50" split of the claimed profits that he (improperly) attributes to the accused products that, in his opinion, would be negotiated between the licensor (Bzeekland) and licensees (Defendants) in the requisite hypothetical negotiation. However, Mr. Bratic failed to offer any quantitative support for this 50/50 split and failed to tie the split to the facts of the case and the hypothetical negotiation.  Mr. Bratic's arbitrary split is therefore just as unreliable as the 25% rule of thumb that the Federal Circuit rejected in *Uniloc* and renders Mr. Bratic's final damages opinion against Samsung and Verizon unsupported and inadmissible.

Second, Mr. Bratic's opinions regarding Verizon's purported damages, which is grounded in an allegedly "apportioned" overall subscriber-revenue-per-month figure, is fundamentally flawed and unreliable.  The product accused of infringement in this action (as confirmed by Plaintiff's technical expert, Dr. Gary Lomp) is a Samsung-manufactured network extender ***device*** that is sold by Samsung to Verizon and which Verizon then sells (for a one-time fee), or provides for free, to certain customers.  But Mr. Bratic's starting point for his calculation of damages against Verizon is not the most logical one (*i.e.*, the revenue Verizon makes from the one-time sale of these products to its customers, which still would need to be further

1

apportioned).   Instead, Mr. Bratic starts with the average monthly subscriber revenue that Verizon obtains from all of its cellular customer accounts for the variety of services those customers receive from Verizon (*e.g.,* cellular service, text messaging services, etc.).   Mr. Bratic uses cellular subscriber revenue for his damages analysis because it allegedly represents the incremental profits for Verizon due to customers retained by the accused network extenders. However, Mr. Bratic relies on no studies or surveys to prove that the network extenders were the *sole* reason certain customers remained with Verizon, ignores evidence that contradicts his key assumptions, and does not even attempt to argue that the network extenders drove demand for Verizon's cellular subscription plans.   As the Federal Circuit has noted, Mr. Bratic's fundamentally flawed starting point, even with adjustments allegedly related to the facts of the case, leads to a fundamentally flawed conclusion, like the one that Mr. Bratic reached in this case.

Third, rather than assessing the individual value of each of the three patents-in-suit, Mr. Bratic provides a single reasonable royalty damages amount for each of Samsung and Verizon that assumes all three of the asserted patents claim entirely overlapping (*i.e.*, identical) inventions.  This approach, which is backed by no economic or technical support, fails to value each of the three asserted patents based on the economic footprint of that particular patent's invention.   Moreover, in treating all of the patents-in-suit as if they all claim identical and inseparable inventions, Mr. Bratic fails to account for the different hypothetical negotiations applicable to each patent – which implicate not just different dates and damages periods, but also other important facts relevant to the hypothetical negotiation such as the availability of non-infringing alternatives.

Finally, Mr. Bratic improperly opines that Plaintiff would have collected two separate

royalty payments on the same accused products for the same asserted patents.  Mr. Bratic's opinion that both Samsung and Verizon would have paid a royalty to the ***same*** party for the ***same*** products on the ***same*** infringement claims violates common sense and constitutes an impermissible double recovery for the Plaintiff.  Allowing Mr. Bratic to present his double recovery theory to the jury will impermissibly skew their opinions about the appropriate damages award, cause them to award a legally improper damages award, and should be excluded.

Because these fundamental flaws render Mr. Bratic's opinions as a whole speculative and unreliable, the Court should strike Mr. Bratic's expert report and preclude him from testifying at trial under *Daubert* and the Federal Rules of Evidence.

## II.   STATEMENT OF FACTS AS TO DEFENDANTS' DAUBERT MOTION

### A.   Mr. Bratic's Calculated Royalty Rate for Verizon's Purported Infringement

Mr. Bratic's analysis under Georgia Pacific Factor No. 11 uses five steps to arrive at the sole quantitative data point that Mr. Bratic relies on for purposes of his damages opinion.

In <u>Step 1</u>, Mr. Bratic identifies the average revenues received per Verizon wireless account per month ("ARPA"), which he derived from Verizon's wireless subscription plans from 2012 to 2018, and which he calculates as ███████ per account, per month.  Ex. 1 at ¶ 235.  Notably, this starting point has nothing to do with Verizon's revenues associated with the sales of the accused network extender products – which Mr. Bratic asserts (by relying on Dr. Lomp) is itself the smallest saleable unit.  *Id.* at ¶ 257.  Indeed, this starting per-month ARPA is not tied to revenue from accounts associated with network extenders at all, but is calculated from <u>all</u> Verizon retail postpaid accounts for cellular service.  Ex. 2 (Exhibit 5.1 to Mr. Bratic's Expert Report).  The ███████ per account, per month reflects the average revenue per account that Verizon receives from cellular customers based on ***all*** of the services that the account holder

receives from Verizon (e.g., data plans, cellular plans, roaming charges, overages for one or more devices).  In Step 2, Mr. Bratic applies a ██████ profit margin to the ██████ARPA to purportedly measure a monthly profit per account (again, for *all* services provided on that account) of ████.  *Id.* at ¶ 235.  In Step 3, Mr. Bratic calculated that Verizon distributed ████ of its network extenders to its customers free of charge and assumed that all of those accounts would have churned, or voluntarily left Verizon, if Verizon had charged them for the extender. *Id.*  Mr. Bratic then applied his ████free extender accounts value (his "apportionment factor") to his ████ARPA profit calculation to reach a value of ████per account per month, which he claims is the "estimated subscription plan profits retained as a result of providing network extenders."  *Id.*  In Step 4, Mr. Bratic calculated an average cost of ████ per network extender per month to Verizon, which he then deducts from ████to reach a total of "approximately ████ in retained incremental profits per Network Extender account per month."  *Id.*  In Step 5, Mr. Bratic then opines that "Verizon and Bzeekland [owner of the '284 patent in 2011] would, conservatively, have then agreed to a 50/50 split of this apportioned value ████ attributed to the Patents-in-Suit."  Ex. 1 at ¶ 254.  Mr. Bratic cites to no quantitative basis for his 50/50 split, nor any past licensing practices by Verizon or Plaintiff that would have suggested such a split was reasonable.  The 50/50 split resulted in a reasonable royalty rate of ████ per network extender account per month for Verizon's infringement of all three patents-in-suit.  *Id.* at ¶ 267.

To reach his final damages figure for Verizon, Mr. Bratic multiplied the ████ royalty rate by the number of "active" network extender devices "in service account months."  *Id.* at ¶¶ 277, 278.  This resulted in claimed reasonable royalty damages against Verizon from February 1, 2012 through August 19, 2019 (trial) ████████.

## B.  Mr. Bratic's Calculated Royalty Rate for Samsung's Purported Infringement

Mr. Bratic opines that Samsung also would have paid a reasonable royalty to Bzeekland

(Plaintiff's predecessor) for the same patents, based on Samsung's sale of the same accused network extenders to Verizon.   To determine this additional reasonable royalty Mr. Bratic considered the number of units, revenue and costs from Samsung's sales of network extenders to Verizon and concluded that the relevant royalty rate is premised on Samsung's gross profits attributable to network extenders.   Specifically, Mr. Bratic concluded that "from February 1, 2012 through December 31, 2018, Samsung generated approximately ▇▇▇▇ in gross profits per Network Extender sold to Verizon."  Ex. 1, at ¶ 270.   Mr. Bratic opined that the parties would have agreed to a 50/50 split of the gross profits as a reasonable royalty, "despite Bzeekland's significant bargaining leverage in the hypothetical negotiation" because "Bzeekland would have been willing to accept a royalty that reflected one-half of the profits attributable to the Patents-in-Suit" and "Samsung would have recognized that, in agreeing to a 50/50 split of a conservative measure of the profits attributable to the Patents-in-Suit, Bzeekland was making a concession to Samsung."  *Id.* at ¶ 273.

Again, as with Verizon, Mr. Bratic cited to no quantitative basis for his 50/50 split, nor any past licensing practice by Samsung that would have suggested such a split was reasonable. A 50/50 split of the gross profits resulted in a royalty rate, according to Mr. Bratic, ▇▇▇▇ per network extender.  *Id*. at ¶ 274.  Mr. Bratic calculated the total royalty by multiplying the royalty rate ▇▇▇▇ by the royalty base ▇▇▇▇▇▇▇▇▇ *Id.*  Mr. Bratic's calculations based on Samsung's sales of network extenders to Verizon results in claimed reasonable royalty damages against Samsung from February 1, 2012 through August 19, 2019 (trial) ▇▇▇▇▇▇

## III.   LEGAL STANDARDS

An expert who is qualified may testify in the form of an opinion if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the

case.  Fed. R. Evid. 702.  Rule 702 imposes a "special obligation upon a trial judge" to "ensure the reliability and relevancy of expert testimony."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 152 (1999).  The Court exercises this gatekeeping role to preclude expert opinions that are neither reliable nor tied to the relevant facts and circumstances of this case.  *Daubert*, 509 U.S. at 598; *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  Vigilance in precluding the admission of such expert testimony is critical because of its potentially misleading and powerful influence on untrained jurors.  *Daubert*, 509 U.S. at 590, 595; Fed. R. Evid. 702.  Such vigilance "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592-93.

The party tendering an expert bears the burden of establishing the admissibility of the expert's testimony and of persuading the court to allow the expert to testify.  *Daubert*, 509 U.S. at 592 n.10; *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  To carry this burden, a patentee must sufficiently tie the damages expert's opinion to the facts of the case.  *Uniloc*, 632 F.3d at 1315 (citing *Daubert*, 509 U.S. at 589); *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1332-1333 (Fed. Cir. 2014).  The expert's damages opinion also must be based on "sound economic and factual predicates."  *LaserDynamics,* 694 F.3d at 67) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)).  A damages expert must carefully tie his opinions to the "claimed invention's footprint in the marketplace."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

## IV.   ARGUMENT

### A.   Mr. Bratic Improperly Invokes the Nash Bargaining Solution to Devise Royalty Rates for Both Verizon and Samsung

After using legally erroneous and unsupported methodologies described below to arrive

at the profits Verizon and Samsung would have received allegedly due to the patents-in-suit, Mr. Bratic improperly splits those alleged profits 50/50 between Bzeekland and the respective licensee to reach his final royalty rate.  He offers no quantitative basis for this 50/50 split, as the sum total of Mr. Bratic's application of what amounts to applying the Nash theorem are vague, non-quantitative statements that Bzeekland had "significant bargaining leverage" (Ex. 1, at ¶¶ 266, 273) and that Verizon and Samsung would realize that Bzeekland was making a "concession" to Verizon or Samsung by agreeing to a 50/50 split (Ex. 1 at ¶¶ 266, 273). Specifically, Mr. Bratic contends that Bzeekland would have demanded a significant portion of Defendants' incremental profits because: (1) "there were no non-infringing alternatives that provided the same or similar benefits and functionality as did the teachings of the Patents-in-Suit, without infringing the Patents-in-Suit"; and (2) the balance of the *Georgia-Pacific* factors favored Bzeekland.  *Id.* at ¶¶ 264-266.  Mr. Bratic also opines that Verizon would have been willing to split its incremental profits in half, ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████   *Id.* at ¶¶ 265-266.  The only additional basis for Mr. Bratic's opinion that Bzeekland and Samsung would agree on a 50/50 split was ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████   *Id.* at ¶ 268.

While Mr. Bratic does not refer to his use of the Nash Bargaining Solution by name, Mr. Bratic has functionally invoked the Nash Bargaining Solution to reach his conclusion without providing requisite support.  In *VirnetX, Inc. v. Cisco Systems, Inc.*, the Federal Circuit rejected

the use of the Nash Bargaining Solution where the parties to a negotiation agree to a solution where "each bargainer get[s] the same money profit" (*e.g.*, a 50/50 split of profits) any time certain conditions are met.  767 F.3d 1308, 1325 (2014).  In that case, VirnetX's expert, Mr. Weinstein, determined the purported incremental or additional profits associated with use of the patented technology.  Then Mr. Weinstein opined the parties would negotiate how to split the incremental profits by beginning with "the assumption that each party would take 50% of the incremental profits."  *VirnetX*, 767 F.3d at 1331.  Mr. Weinstein then adjusted the 50/50 split based on "the relative bargaining power of the two entities."  *Id.*  On appeal, Apple equated Mr. Weinstein's 50/50 split of incremental profits to the 25% rule of thumb rejected by the Federal Circuit in *Uniloc.*  *Id.*  The Federal Circuit agreed that Mr. Weinstein's use of the Nash theorem was not sufficiently reliable because it was not tied to the facts of the case at hand.  *Id.* at 1332-33.  Indeed, the Court noted that Mr. Weinstein's "conclusory [final] assertion[]" that a 45/55 split of profits was appropriate (based only on the fact that "Apple would have additional bargaining power over VirnetX back in ...2009") demonstrated how a presumptive 50/50 split of profits was "subject to abuse."  *Id.* at 1333.

Here, Mr. Bratic's conclusory assertion that a 50/50 split of profits would result from the hypothetical negotiations is ***even less*** supported than the opinions of Mr. Weinstein's rejected by the Federal Circuit in *VirnetX*.  Mr. Bratic's opinion, like Mr. Weinstein's, runs a "significant risk of inappropriately skewing the jury's verdict" because it does not simply ***start*** at an unsupported 50/50 baseline, it ***ends*** there.  *VirnetX,* 767 F.3d at 1333.  *See also Good Tech. Corp. v. Mobileiron, Inc.*, Case No. 5:12-cv-05826, 2015 WL 4090431 (N.D. Cal. Jul. 5, 2015) (excluding expert opinion that began with an 50/50 profit split where expert failed to tie the 50/50 split to the specifics of the case or to explain why such a split would be reasonable "other

than to invoke a boilerplate assertion about the relative bargaining power of the parties").  In other words, in violation of *VirnetX* and its progeny, Mr. Bratic does not explain his starting point for his 50/50 split, provides no meaningful justification for his 50/50 endpoint, and gives no indication that he ever considered any specific split **other than** 50/50.  He provides no licensing history of either party that is consistent with his approach, and ignores Bzeekland documents that suggest Bzeekland would have had little bargaining power cited elsewhere in his report.  (*See, e.g.,* Ex. 1, at ¶ 18 ███████████████████████████

████████████ ¶¶ 155-158 ███████████████████████████████████████

██████████ ¶ 159 ████████████████████████████████████████.

For all of the foregoing reasons, Mr. Bratic's opinion as to why the parties would have split the alleged profits 50/50 is not backed by an analysis that would aid the jury in assessing the probative value of his opinion.  Nor is it an analysis that would provide Defendants with a meaningful opportunity to conduct a cross-examination of this opinion.  As this is the only basis for calculating Mr. Bratic's claimed reasonably royalty his opinions should be excluded.

### B. Mr. Bratic Fails to Consider Reasonable Royalty Damages Based on Revenue Properly Connected to the Accused Products

A damages expert must carefully tie his opinions to the "claimed invention's footprint in the marketplace." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012 (citations omitted).  That means that "the patentee...must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, not conjectural or speculative." *Garretson v.* Clark, 111 U.S. 120, 121 (1884).  Mr. Bratic's sole quantitative basis for his damages opinion with respect to Verizon violates these apportionment principles and would improperly reward Plaintiff with a portion of Verizon's wireless

subscription revenues that have no relationship to the patented inventions.  That is because Mr. Bratic's damages opinion for Verizon is not based on the modest revenues that Verizon makes from the sale of the accused network extenders to its customers (the most logical starting point for a reasonable royalty analysis based on those devices), but instead on the revenues earned from subscribers for access to the *entire* Verizon cellular wireless network and all of its associated services.  In other words, Mr. Bratic's ████ ARPA starting point admittedly has nothing to do with the accused products (the network extender) that Mr. Bratic contends is the smallest saleable unit practicing the patents-in-suit.  *Id.* at ¶ 245.  In fact, this revenue is calculated from all Verizon retail postpaid accounts for wireless services, including those *without* network extenders.  Ex. 2 (Bratic Report Exhibit 5.1).  The ARPA thus reflects revenue for services entirely unrelated to network extenders, including some services that would *never* be used by a network extender like caller name ID ($2.99 per month per line), visual voice mail ($2.99 per month per line), Verizon Roadside Assistance ($3 per month) and Cruise Ship Preferred Pricing ($2.99 per minute).  Notably, Mr. Bratic's ARPA starting point does *not* include a monthly recurring network extender charge because Verizon never charged anything other than a one-time charge for the network extenders.

This ARPA starting point is not and cannot be considered a measure of Verizon's income or financial returns associated with selling or using network extenders.  Mr. Bratic relied on no surveys or studies which suggested that the network extenders drove demand for Verizon's wireless services.  He also pointed to no reliable evidence that the network extenders were the *only* reason that certain customers did not leave Verizon.  (Indeed, there is evidence produced by Verizon that suggests it is not.)  Mr. Bratic's ARPA starting point is simply a way to get a disproportionally large dollar figure in front of the jury and to avoid the most obvious potential

double-counting issues (*i.e.*, opining that a per-extender royalty is due from both Samsung and Verizon).  Consequently, Mr. Bratic's starting point is fundamentally flawed and violates the Federal Circuit requirement that the damages analysis be tied to the claimed invention's footprint in the market place.  *ResQNet.com*, 594 F.3d at 869.

There can be no dispute that Verizon's 3G and 4G wireless services provide value to customers outside of any use involving network extenders.  In fact, Barkan's technical expert, Dr. Lomp, admitted during his deposition that femtocells (*e.g.*, network extenders) cannot be used without 3G and 4G standard essential patents, and that these patents were valuable.  Ex. 3 (Lomp Depo. Tr.) at 226:6-233:10; 235:13-236:15.  Yet, Mr. Bratic failed to account for the value of these non-patented features.  Mr. Bratic's purported "adjustment" of Verizon's estimated monthly profit per Verizon wireless subscriber account ████████cannot cure the fundamental flaw with his analysis.  The ██████████ is based on ████████████ ███████████████████████████████████████████████████and is not equivalent to any approximation of the value of the patented invention.  It is premised on ███ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Mr. Bratic also ignored evidence produced by Verizon to the contrary, ███████████████ ██████████████████████████Making a ████████reduction to Verizon's overall wireless network subscription revenue based on these assumptions is inherently unreliable and does not even pretend to reflect a reliable apportionment of the value of the patented features.

In short, Mr. Bratic's use of Verizon's ARPA as a starting point, and his failure to apportion his claimed royalty based on the value of the patented features, was devoid of any

11

showing that the accused network extenders created the basis for customer demand that resulted in the revenues for the *entire* Verizon wireless services.  While the facts of Federal Circuit decisions rejecting a plaintiff's use of the entire market value rule do not perfectly match the facts here, the reasoning invoked in those cases does.  The EMVR "allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts'."  *Uniloc,* 632 F.3d at 1318 (citations omitted).  But "[w]hen the [accused] product contains other valuable features, the patentee must prove that those other [nonpatented] features do not cause consumers to purchase the product." *Power Integrations, Inc. v. Fairchild Semiconductor*, 904 F.3d 965, 979 (Fed. Cir. 2018).

The court's reasoning behind the EMVR is that "the disclosure that a company has made [in that case] $19 billion in revenue from an infringing product cannot help but skew the damages horizon for the jury…."  *Uniloc,* 632 F.3d at 1320.  Here, Mr. Bratic goes beyond even the entire market value of the network extender; he starts with the value of average revenue per account for all Verizon wireless accounts ███████ an amount that cannot help but skew the damages horizon for the jury.  His adjustments that follow – even if purporting to connect the ARPA down the line to certain accounts ███████████████████████ – violate the Federal Circuit's prohibition against starting from a flawed premise and do not properly or reliably apportion for the value of the patented invention.  *Uniloc,* 632 F.3d at 1317.  Mr. Bratic's unreliable and faulty "apportionment" for the value of the patented inventions to Verizon should therefore be excluded.

### C.     The Court Should Strike Mr. Bratic's Opinions Because He Fails To Address The Three-Asserted Patents On An Individual Basis

Mr. Bratic acknowledges, as he must, that the three asserted patents claim different

inventions.  Ex. 1, at ¶ 118 ("The '284 Patent describes in general terms a femtocell device.  The '312 Patent adds claims that relate to specifics of GPS tracking, as opposed to simply reporting location.  The '638 Patent includes further specifics relating to cell size and power, as well as recurrent transmission of data.")  Indeed, for Barkan to obtain three different patents, there must be different purported inventions in each patent.  However, Mr. Bratic opines that, *regardless of whether one, two or all three patents are allegedly infringed,* Barkan is entitled to a royalty of ███ per Verizon wireless network extender account per month due to Verizon's infringement, *and* a royalty of ███ per network extender sold by Samsung to Verizon due to Samsung's infringement.  Ex. 1 at ¶¶ 280, 281.

In other words, Mr. Bratic does not identify individual royalty rates that accurately reflects the economic footprint for each of the asserted patents, nor does he even address (let alone establish) the value of each claimed invention – which would be necessary to offer reliable opinions  depending on which patents (if any) are found to be valid and infringed.  By collapsing his damages analysis with respect to the three Barkan patents into a single royalty rate that pays no heed whatsoever to the distinct invention claimed by each patent, Mr. Bratic necessarily fails to adequately "tie proof of damages to the claimed invention's footprint in the market place."  *ResQNet.com,* 594 F.3d at 869; *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.,* 809 F.3d 1295, 1310 (Fed. Cir. 2015); *see also Ericsson, Inc. v. D–Link Sys., Inc.,* 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Mr. Bratic compounds this error by claiming that "the outcome of the hypothetical negotiation would remain the same if *any one or more* of the Patents-in-Suit are determined to be valid and infringed."  Ex. 1, at ¶ 275.  In other words, Mr. Bratic assumes (without support) that the outcome of the hypothetical negotiation would be the same whether one, two or three patents

13

were at issue in the negotiations and regardless of when that hypothetical negotiation occurred. But as Mr. Bratic acknowledges (Ex. 1 at ¶ 5) each asserted patent has a different issue date, meaning that the date of any hypothetical negotiation for each patent is different.  These different dates result in changed circumstances that would have been present at the different hypothetical negotiations that Mr. Bratic simply ignores.  For example, a hypothetical negotiation for the '312 and '638 patents would also have a different licensor than the licensor to a hypothetical negotiation that includes the '284 patent.  Ex. 1, at ¶ 117.  As another example, non-infringing alternatives were more advanced at the time of the issuance of the '638 patent, which Mr. Bratic ignores by focusing solely on a hypothetical negotiation that would have occurred at the time of the issuance of the '284 patent.  Ex. 1, at ¶ 153 (acknowledging that Samsung and Verizon assert Wi-Fi calling is a noninfringing alternative, but noting that in Mr. Bratic's view Wi-Fi calling was not acceptable and commercially available until years after his 2011 hypothetical negotiation).

Mr. Bratic's unsupported and unreliable choice to treat all three patents-in-suit as indistinguishable is unreliable and contrary to Federal Circuit law.  It also significantly increases the risk that a jury would improperly award an unreasonably high damages award even if only one of the three Patents-in-Suit is found to be valid and infringed.  For this reason alone, Mr. Bratic's opinions should be excluded.

### D.  Mr. Bratic Improperly Opines that Plaintiff Would be Entitled to Two Royalty Payments on the Same Accused Products

There is no dispute that Samsung manufactures and sells network extenders to its customer, Verizon, and that Verizon re-sells or distributes those same network extenders.  Ex. 1, at ¶ 128 ██████████████████████████████████  And Barkan asserts that Samsung and Verizon directly infringe the same patent claims with the same

Samsung network extender products.  Ex. 4 (Lanning Reb. Rep.), at ¶¶ 92-94.  Notwithstanding the complete overlap between the accused products and patent claims, Mr. Bratic asserts that a royalty payment is due from both Samsung and Verizon.  Specifically, Mr. Bratic opines that in the hypothetical negotiation, (1) Samsung would have agreed to pay ▮▮▮ to Barkan for every network extender it sold to Verizon, *and* (2) Verizon would have agreed to pay ▮▮▮ per month for each account associated with the same network extender it received from Samsung that Verizon resold or distributed to a customer.  Ex. 1, at  ¶¶ 274, 267.

Mr. Bratic's opinions that Plaintiff would have collected what amounts to a double recovery for the same allegedly infringing product are unreliable and legally flawed.  Mr. Bratic also failed to consider and account for how the parties would have patent exhaustion during a hypothetical negotiation.  Verizon, for example, would know that if Samsung agreed to pay ▮▮▮ for every network extender Samsung sold to Verizon then Plaintiff's infringement claims with respect to those products would be exhausted.  *See Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1532-1535 (2017).  Because Mr. Bratic's report includes no analysis or discussion of the potential impact of exhaustion on the hypothetical negotiation, his conclusions are based on insufficient facts and data in violation of Federal Rule of Evidence 702 and are unreliable.  Moreover, Mr. Bratic's double-recovery opinions run a significant risk of causing the jury to commit the legal error of awarding two damages awards on the same asserted products.  For this additional reason, Mr. Bratic's two damages opinions should be excluded.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court strike Mr. Bratic's damages expert report and preclude Mr. Bratic from testifying at trial.

15

Dated:  May 15, 2019            Respectfully submitted,

By:  */s/ Mark Fowler*           
     Melissa R. Smith
     melissa@gillamsmithlaw.com
     State Bar No. 24001351
     GILLAM & SMITH LLP
     303 S. Washington Ave.
     Marshall, TX  75670

     Mark Fowler (*pro hac vice*)
     mark.fowler@dlapiper.com
     Aaron Wainscoat (*pro hac vice*)
     aaron.wainscoat@dlapiper.com
     Erik R. Fuehrer
     erik.fuehrer@dlapiper.com
     DLA Piper LLP (US)
     2000 University Avenue
     Palo Alto, CA  94303-2215
     Tel:  (650) 833-2000
     Fax:  (650) 833-2001

     James M. Heintz (*pro hac vice*)
     jim.heintz@dlapiper.com
     11911 Freedom Drive
     Reston, VA  20190
     Tel:  (703) 733-4000
     Fax:  (703)733-5000

     Patrick S. Park (*pro hac vice*)
     patrick.park@dlapiper.com
     DLA PIPER LLP (US)
     2000 Avenue of the Stars
     Suite 400 North Tower
     Los Angeles, CA  90067-4704
     Tel:  (310) 595-3000
     Fax:  (310) 595-3300

**ATTORNEYS FOR DEFENDANTS SAMSUNG
ELECTRONICS CO., LTD. and SAMSUNG
ELECTRONICS AMERICA, INC.**

16

By: <u>*/s/ Kevin P. Anderson*</u>
    Michael E. Jones
    State Bar No. 10929400
    mikejones@potterminton.com
    POTTER MINTON
    A Professional Corporation
    110 N. College, Suite 500 (75702)
    P.O. Box 359
    Tyler, TX  75710
    Tel:  (903) 597-8311
    Fax:  (903) 593-0846

    Kevin P. Anderson
    D.C. Bar No. 476504
    kanderson@wileyrein.com
    WILEY REIN LLP
    1776 K Street NW
    Washington, DC  20006
    Tel:   (202) 719-7000
    Fax:  (202) 719-7049

    **ATTORNEYS FOR DEFENDANT
    CELLCO PARTNERSHIP D/B/A VERIZON
    WIRELESS**

## <u>CERTIFICATE OF CONFERENCE</u>

  Counsel for Defendants has complied with the meet and confer requirement in L.R. CV-7(h).  Personal conferences required by this rule were conducted on May 14, 2019.  Counsel for Plaintiff and counsel for Defendants spoke via telephone regarding the contents of the above-motion.  Appearing for Plaintiff were Bill O'Connell and Jenna Farleigh.  Appearing for the Samsung Defendants were Aaron Wainscoat and Erik Fuehrer and appearing for Verizon were Kevin Anderson and Alison Hutton.  Plaintiff did not agree regarding the requested relief, and thus discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.  Plaintiff opposes Defendants' motion.

<em>/s/ Melissa Smith</em>   

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned certifies that on this 15th day of May, 2019, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email on this the 15th day of May, 2019.



<em>/s/ Melissa Smith</em>    

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

  I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this matter.

<em>/s/ Melissa Smith</em>   

18